GRIFFITH MOTORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Griffith Motors, Inc. v. Commissioner
Docket No. 4655-75.
United States Tax Court
T.C. Memo 1977-84; 1977 Tax Ct. Memo LEXIS 354; 36 T.C.M. (CCH) 370; T.C.M. (RIA) 770084; March 29, 1977, Filed; As Amended April 4, 1977. I. C. Waddey, Jr. and Alfred H. Knight III, for the petitioner. William Robert Pope, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: 1971
$3,835.24
1972
$3,836.19
The only issue for decision is whether petitioner is entitled under section 162(a)(3) [1]/ to deduct the full amount of the rents it paid during the years in issue in respect of real property used in its automobile dealership. *355 FINDINGS OF FACT Petitioner Griffith Motors, Inc. (hereinafter petitioner), a corporation organized under the laws of the State of Tennessee, had its principal place of business in Johnson City, Tennessee, at the time its petition was filed. Petitioner filed corporate Federal income tax returns for 1971 and 1972 with the Memphis, Tennessee, Service Center. At all times relevant to this case, petitioner was engaged in the operation of a Pontiac-Buick automobile dealership in Johnson City, Tennessee. For several years prior to 1959, petitioner's stock was owned by Andrew Griffith (hereinafter Griffith). During 1959, James Allen (hereinafter Allen) began negotiations with Griffith for the purchase of petitioner's stock. On March 17, 1959, Griffith submitted a letter of intent to Allen, and on October 30, 1959, a formal agreement to purchase petitioner's stock was executed by Allen and Griffith. Pursuant to the terms of the purchase agreement, Allen executed a promissory note for $40,000 payable to Griffith and, simultaneously, agreed to continue payments on a $61,500 promissory note previously executed by petitioner and payable to Griffith National Corporation, a corporation *356 owned by Griffith, bringing the total consideration to $101,500. In exchange, Allen received the 400 outstanding shares of petitioner's stock. However, 100 shares of such stock was to remain in Griffith's name on petitioner's books in order to allow Griffith to retain the advantage of some General Motors Corporation (GMC) life insurance policies and to keep his name on the GMC franchise agreement. As a further condition of the purchase agreement, Allen's salary was not to exceed $10,000 per year plus a bonus of 20 percent of petitioner's net profits before taxes. Allen was obligated to apply 60 percent of any bonus he received against his and petitioner's indebtedness to Griffith and Griffith National Corporation. Allen's salary was subsequently increased several times and by February 12, 1969, was set at $30,000 per year. By February 18, 1970, Allen had paid the $40,000 note to Griffith. Except for the 100 shares held in Griffith's name, Allen has been the sole shareholder and president of petitioner since the 1959 sale transaction. Since its formation, petitioner's business operations had been conducted in a rented building located at 84 Wilson Avenue in Johnson City. *357 During 1963, it became obvious that the building was inadequate and, when GMC informed Allen that petitioner's expansion needs required a new building, Allen began seeking a suitable location. On August 7, 1963, Allen entered into an agreement with Orville and Mary Martin (the Martins) by which Allen was granted an option to lease, coupled with an additional option to purchase, an unimproved tract of land located at the intersection of West Market Street and Indian Road in Johnson City. His plan was to construct a building to house petitioner's automobile business. However, Allen was unable to obtain financing for the necessary improvements because the Martins would not subordinate their interest in the property to a construction mortgage. Moreover, Griffith objected to petitioner incurring the indebtedness required to construct a building. Allen's certified public accountant informed Allen that he might be able to obtain financing for the construction of a building through an organization known as Gump Realty (hereinafter referred to as Gump), which had financed higher risk transactions than those ordinarily accepted by conventional lending institutions. Allen talked *358 with Gump's representatives and learned that Gump was unwilling to construct a building for lease to petitioner. However, because of Allen's reputation and credit standing, Gump would construct a building if Allen rather than petitioner were the lessee. Needing a new building to which petitioner's business could be moved, Allen agreed to Gump's terms, and, as a result, the following transactions took place on October 7, 1963: 1. Gump leased from the Martins the real estate which had been under option to Allen. The lease contained the same substantive provisions as the lease and option then held by Allen, including the right to purchase the land for $80,000 at the termination of the lease. 2. Gump assigned the lease and purchase option to Allen in his individual capacity and Allen thereby assumed all of the obligations under the lease from the Martins. 3. Gump and Allen, again in his individual capacity, also entered into an agreement described as a sublease and option agreement covering the Martin property. Under this agreement, Gump was to construct a building, to Allen's specifications, containing an automobile show room at a cost not to exceed $125,000. Any costs *359 in excess of $125,000 were to be paid by Allen. Allen, in turn, leased the building from Gump. The lease contained an option to purchase the building for amounts varying between $106,400 and $50,000, depending on the year the option would be exercised. The term of the lease was a period of 20 years, commencing October 1, 1963, and ending September 30, 1983. The rental was $1,250 per month for the first 3 years and $1,009.16 per month for the remaining 17 years of the lease. In addition to the rental payments to Gump, Allen was obligated to pay to the Martins rentals ranging from $300 per month during the period October 1, 1963 to September 30, 1968 and $325 per month for the period October 1, 1968 through September 30, 1973. The following schedule reflects Allen's monthly rental obligations for the Martin real estate and the Gump building: Monthly
Monthly
Total Monthly
Payments by
Payments by
Rentals Paid Period
Allen to Martin
Allen to Gump
by Allen
10/1/63
thru
9/30/66
$300.00
$1,250.00
$1,550.00
10/1/66
thru
9/30/68
300.00
1,009.16
1,309.16
10/1/68
thru
9/30/73
325.00
1,009.16
1,334.16
Allen then subleased the land and *360 building to petitioner for a 6-year term beginning October 16, 1963, at $1,000 per month for the first 3 months, and beginning January 1, 1964, at $2,000 per month, or $24,000 per year. At the end of the original 6-year sublease by Allen to petitioner, the parties continued to operate on a month-to-month basis under the terms of the expired lease until June 1, 1970, when a 10-year sublease agreement was entered into between Allen and petitioner. This new sublease covered the Martin tract along with an additional tract of contiguous property Allen had leased from A.S. and Vesta Lacey (hereinafter the Laceys) in 1965. Under the terms of the new sublease, petitioner was obligated to pay Allen $3,250 per month or $50 per new automobile sold, whichever was greater. Respondent and petitioner have agreed that $2,000 per month ($24,000 for the year) of the rental payments under the June 1, 1970, sublease are attributable to use of the Martin property and improvements. [2]/ *361 Between late 1963 and 1971, Allen made numerous leasehold improvements at his own expense, including the addition of lights on the new car lot at a cost of $3,023.47, and construction of salesmen's offices, enclosure of a portion of the main building, and the addition of carpets to the main building at a cost of $15,483.22. In addition, the value of the property subleased to petitioner increased significantly over that period of time. During the years 1971 and 1972, Allen was obligated to and did pay Gump and the Martins, $1,009.16 and $325 per month, respectively, a total of $1,334.16 per month, or $16,009.92 for each of those years. During that same period, petitioner paid Allen $2,000 per month or $24,000 per year attributable under the June 1, 1970, lease agreement covering the Martin tract. Respondent determined that petitioner's $24,000 rental deductions attributable to the Martin tract for 1971 and 1972 were excessive to the extent they exceeded $16,009.92, the amount payable annually by Allen to Gump and the Martins. Accordingly, respondent disallowed $7,990.08 of petitioner's claimed rental deductions for both 1971 and 1972, determining they were not deductible under *362 section 162(a)(3). OPINION Section 162(a)(3) [3]/ provides that a taxpayer may deduct all ordinary and necessary expenses incurred in carrying on a trade or business including rentals or other payments required to be made for the use of business property. Respondent contends that a portion ($7,990.08 per year) of the rents paid by petitioner to Allen ($24,000 per year) for the sublease of the Martin property was excessive and, therefore, not deductible as an ordinary and necessary business expense. Respondent maintains that the rents paid by petitioner should not have exceeded the amounts paid by Allen (a total of $16,009.92) for the use of the Martin property and the Gump building under the terms of the October 7, 1963, lease agreements. In respondent's view, Allen, the controlling shareholder of petitioner, was acting as its agent when he executed the lease agreements with Gump and, therefore, petitioner did not pay the disallowed amount ($7,990.08 per year) "as a condition to the continued use or possession" of the property. *363 Petitioner, on the other hand, contends that Allen was not acting as the agent of petitioner when he executed the October 7, 1963, leases. Gump had refused to deal with petitioner and, because of Allen's financial resources, would deal only with him. Otherwise, the needed new building would not have been constructed. Petitioner maintains that Allen was entitled to the additional rent because of his financial exposure under the 20-year lease agreements with the Martins and Gump and his outlays of personal funds for the improvements such as the new car lot lights, construction of the salesmen's offices, enclosure of a portion of the main building, and carpeting. In granting the allowance for rental deductions, section 162(a)(3) does not expressly limit such deductions to a reasonable allowance. It is clear, nonetheless, that such deductions may not exceed what the taxpayer was required to pay as a condition for the continued use and occupancy of the property. ; , affd. per curiam , cert. denied . *364 Where there is a close relationship between the lessor and lessee, as in the instant case, the facts must be carefully examined to see that the payments were actually rent rather than disguised dividends, salary, or other corporate distributions. A determination must be made as to whether the rents in fact exceed what would be paid had the lease been negotiated at arm's length with a stranger. ; , revg. a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court. [4]/ *365 From the record, it is clear that the lease agreement between Allen and Gump was an arm's-length transaction between strangers, each striking the most advantageous bargain possible. It is equally clear that the sublease by Allen to petitioner was a transaction between closely-related parties. Respondent takes the position that because of this close relationship, the rentals received by Allen from petitioner should not have exceeded what Allen was obligated himself to pay for the property. Further, respondent contends that the rentals paid by Allen under the October 7, 1963, lease to Gump are determinative of the fair rental value of the property and, accordingly, petitioner's rents should not exceed those amounts. We disagree. Respondent would have us view all the arrangements made on October 7, 1963, as a unified transaction and would therefore treat Allen as a "real estate" agent for petitioner. However, respondent overlooks the fact that Gump would not deal with petitioner but chose to deal only with Allen. The trial record convinces us that Gump's decision was not adopted as a collusive design to enable petitioner to syphon some of its profits to Allen in the guise of *366 rents but was adopted for valid business reasons. In 1959 petitioner's Buick-Pontiac agency was located in an old downtown building with a showroom in which only two cars could be crowded and with nearby outside space for the display of only 10, 15, or 25 new cars. GMC advised a change to more adequate quarters. Allen obtained from the Martins an option for a 17-year land lease coupled with two successive 5-year renewal options. However, the Martins would not allow their land to be subjected to a mortgage for the construction of a new building, and conventional loan companies would not make a loan any other way. In addition, the $61,500 note to Griffith National Corporation had not been paid, and Griffith objected to petitioner undertaking a building program. [5]/ *367 At this point, Allen learned that Gump made high risk real estate loans and investments, but Gump would deal only with Allen, who had other financial resources, not with petitioner. Gump offered to construct a building on the Martin land, at a cost not to exceed $125,000, and lease it to Allen for 20 years, and Allen agreed. On October 7, 1963, the arrangements were formalized. Gump agreed to put $125,000 into a new building, and Allen rented it for 20 years at $1,250 per month for the first 3 years and $1,009.16 per month thereafter. Allen continued to be liable for the rental payments to Martin and further obligated himself to bear the cost of any further required improvements. Allen then subleased the building to petitioner, but there is simply nothing in the testimony showing or permitting a reasonable inference that Allen was acting on behalf of petitioner in his dealings with Gump. Although Allen obviously intended all along to rent the building to petitioner, petitioner did not assume any obligations to Gump under the 20-year lease or to the Martins under the 17-year land lease. Indeed, Gump declined to deal with petitioner and insisted that Allen's credit and resources *368 be placed on the line, [6]/ and they were. Not only did Allen commit himself to meet the rent obligations to Gump and the Martins, he spent over $18,000 of his own money making needed alterations and improvements. Since Allen was not an agent for petitioner in his dealings with Gump, the October 7, 1963, building lease became Allen's personal asset. He was entitled to sublease the building to petitioner on such terms as any lessor and lessee, dealing at arm's length, would arrange. The crucial consideration is whether the rent was paid "as a condition to the continued use or possession" of the building within the meaning of section 162(a)(3). Since there is no prohibition against a lessee's subleasing property to his wholly-owned corporation, the most persuasive evidence showing whether the standard of section 162(a)(3) was met is the reasonableness of *369 the amount of the rent. Petitioner has introduced testimony, including that of an experienced real estate appraiser, a representative of GMC, and a certified public accountant familiar with rental rates in Johnson City, that the rents paid to Allen by petitioner during 1971 and 1972 were reasonable in amount. We find this testimony persuasive. Respondent offered no testimony to the contrary. However, respondent points to the October 7, 1963, lease agreements between Allen, Gump, and the Martins as the only arm's-length transaction and argues that they furnish the only reliable evidence of the reasonable rental value of the property. But respondent overlooks Allen's credit exposure and personal investment as well as the facts that the Allen lease with the Martins was for a term of 17 years and the Gump lease was for a 20-year term, whereas petitioner's lease to Allen was only for a 6-year term. Moreover, the lease in effect during the years in issue was a wholly new lease, executed in 1970, 7 years after the original Martin-Gump-Allen lease agreements were signed.During that 7-year period, inflation had taken its toll, and rents had increased enormously. For purposes of determining *370 the reasonable rental value under a lease executed in 1970, the terms of the 1963 lease have little evidentiary value.
We think respondent's reliance on , affg. a Memorandum Opinion of this Court, is misplaced. In that case, respondent was successful in disallowing rental deductions in a dual-lease transaction similar to the one presented before us. However, the facts were different. Unlike the instant case, the rental deductions in Utter-McKinley Mortuaries were denied for years in which both leases were executed, and the court was unable to find any reason for the rents in excess of those paid the shareholder's lessor. Since the lease here in issue was entered into between Allen and petitioner approximately 7 years after Allen first leased the property and Allen invested his personal funds in altering and improving the building, Utter-McKinley Mortuaries is distinguishable on its facts. We conclude that the rentals paid by petitioner during 1971 and 1972 were not excessive and, accordingly, are fully deductible for those years under section 162(a)(3). See Levenson & Klein, Inc. v. Commissioner, 53 *371 (Jan. 24, 1977). To reflect the foregoing, Decision will be entered for the petitioner. . Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.
2. /↩ Allen had acquired a lease on the Lacey property in 1965 and, in turn, leased that property to petitioner. The amount of rental paid by petitioner for the use of the Lacey property under a lease agreement dated June 1, 1970 ($15,000 per year, i.e., the total rent of $39,000 per year minus the $24,000 allocable to the Martin property), is not in dispute in this case.
3. / SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
4. / This Court stated the test to be applied in , affd. per curiam , cert. denied as follows: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * [Fn. ref. and citations omitted.]↩
5. / Griffith was then a member of petitioner's board of directors and the GMC franchise was held jointly in his and Allen's names. Griffith testified: I told Mr. Allen that I did not at that time, want Griffith Motors to build a building, first of all, Griffith Motors was not financially sound enough to carry the indebtedness of a building, I did not--without some signature of mine, personally I'm sure, I did not want to be saddled with the encumbrance of a--a building of that size which was probably--amounted to as much as the capital of Griffith Motors was worth, or more and that I was not in favor of going out and building a building on our own.↩
6. / On this point, the testimony is clear. Ed Parker, a certified public accountant who arranged the transaction, testified: Q. Were the Gumps willing to make an offer to Griffith Motors, of the nature that they made to Mr. Allen? A. No, they insisted on making the arrangements with Mr. Allen personally.↩